LARSEN, Circuit Judge, concurring in part and dissenting in part.[1]
State courts are the authority on questions of state law. Federal courts must sometimes decide state law questions, but we are the back-ups. We are to follow, not lead.
This case presents two uncertain and important questions of state law: one concerning the proper construction of a Tennessee statute; the other concerning the conformity of a different Tennessee statute with the Tennessee Constitution. The Tennessee Supreme Court has signaled its willingness to decide both of these state law questions, and we have a mechanism-certification-that allows the Tennessee Supreme Court to decide them. I would take advantage of that mechanism to learn from Tennessee's highest court how it would interpret its statutes and its Constitution.
The majority, however, elects to decide the state law questions on its own. It first decides that Tennessee's bad faith statute, Tenn. Code Ann. § 56-7-105(a), does not bar a plaintiff from recovering punitive damages in addition to the penalties provided in the statute. That a prior decision of this court has held to the contrary is no obstacle-the majority overrules this court's published decision in Heil Co. v. Evanston Insurance Co. , 690 F.3d 722 (6th Cir. 2012), on the strength of a single, and questionable, decision of Tennessee's intermediate appellate court, Riad v. Erie Insurance Exchange , 436 S.W.3d 256 (Tenn. Ct. App. 2013). Riad rested entirely on the assumption that a prior decision of the Tennessee Supreme Court had already decided the question that Heil answered. But we know that is wrong: The Tennessee Supreme Court has told us so. See Lindenberg v. Jackson Nat'l Life Ins. Co. , No. M2015-02349-SC-R23-CV, 2016 Tenn. LEXIS 390, at *2 (Tenn. June 23, 2016) (per curiam). Yet the majority overrules Heil anyway. And with Heil gone, the majority proceeds to invalidate Tennessee's recently-enacted punitive damages cap, Tenn. Code Ann. § 29-39-104, because the work of the Tennessee General Assembly is at odds with the majority's view of the jury trial right guaranteed by the Tennessee Constitution.
These two holdings are unnecessary. As to the constitutional holding, it is not even *371 clear that Tennessee's jury trial guarantee provides the rule of decision in this federal diversity action under Erie Railroad Co. v. Tompkins , 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). If it does not, then we have no occasion to construe the Tennessee Constitution. Putting aside the Erie question, the preclusive effect of Tennessee's bad faith statute and the constitutionality of the punitive damages cap are both unsettled questions on which there is no Tennessee Supreme Court authority and little (and conflicting) state law guidance. As such, both questions are ideally suited for certification. Tennessee's highest court has expressed its receptiveness to certification; the State urges certification; and neither Lindenberg nor Jackson National objects to certification.
But since the majority has declined this prudent path, I will also express my views of the merits. On both questions, I believe the majority errs. I respectfully dissent.
I.
Tennessee Supreme Court Rule 23 provides the court with discretion to accept questions certified to it by the federal courts "when the certifying court determines that ... there are questions of [Tennessee law] which will be determinative of the cause and as to which it appears ... there is no controlling precedent in the decisions of the Supreme Court of Tennessee." Here, we have two questions of state law on which "there is no controlling precedent in the decisions of the Supreme Court of Tennessee": (1) whether Tennessee's bad faith statute, § 56-7-105(a), provides the exclusive extracontractual remedy in a breach-of-contract case arising from an insurer's breach of an insurance contract; and (2) whether Tennessee's punitive damages cap, § 29-39-104, violates the Tennessee Constitution. Certification of both questions would, therefore, meet the "no controlling precedent" requirement of Tennessee Supreme Court Rule 23.
U.S. Supreme Court decisions also support certification when there are "[n]ovel, unsettled questions of state law." Arizonans for Official English v. Arizona , 520 U.S. 43, 79, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997). The Court has stressed that certification "save[s] 'time, energy, and resources.' " Id. at 77, 117 S.Ct. 1055 (quoting Lehman Bros. v. Schein , 416 U.S. 386, 391, 94 S.Ct. 1741, 40 L.Ed.2d 215 (1974) ). Most important of all, certification "helps build a cooperative judicial federalism." Lehman Bros ., 416 U.S. at 391, 94 S.Ct. 1741. Federalism concerns are especially weighty-and certification is especially warranted-"when a federal court is asked to invalidate a State's law, for the federal tribunal risks friction-generating error when it endeavors to construe a novel state Act not yet reviewed by the State's highest court." Arizonans for Official English , 520 U.S. at 79, 117 S.Ct. 1055. And, in a passage that feels highly relevant today, the Court called a federal court's "[s]peculation ... about the meaning of a state statute ... particularly gratuitous when ... the state courts stand willing to address questions of state law on certification from a federal court." Id. at 79, 117 S.Ct. 1055 (quotations omitted). Here, while the majority's speculation about the meaning of a state statute results in the invalidation of state law on an equally speculative construction of the state constitution, there is no question the Tennessee Supreme Court "stand[s] willing to address" these novel issues.
One might perhaps question this willingness because the district court did certify two questions regarding the constitutionality of the punitive damages cap, and the Tennessee Supreme Court declined to review the questions. But this ignores why that court did so. The Tennessee Supreme *372 Court refused the certified constitutional questions because the district court had failed also to certify the antecedent question concerning the preclusive effect of the bad faith statute. Accordingly, it seems the questions certified might not have been "determinative of the cause" under Tennessee Supreme Court Rule 23. The Tennessee Supreme Court explained:
The jury determined that the plaintiff was entitled to both the statutory bad faith penalty pursuant to Tennessee Code Annotated section 56-7-105, and punitive damages pursuant to the common law. The issue of the availability of the common law remedy of punitive damages in addition to the statutory remedy of the bad faith penalty is one which has not before been addressed by this Court, was not certified to this Court by the federal trial court in this case, and is not presently before this Court in this case. It appears to this Court that it would be imprudent for it to answer the certified questions concerning the constitutionality of the statutory caps on punitive damages in this case in which the question of the availability of those damages in the first instance has not been and cannot be answered by this Court.
Lindenberg v. Jackson Nat'l Life Ins. Co. , No. M2015-02349-SC-R23-CV, 2016 Tenn. LEXIS 390, at *1-2 (Tenn. June 23, 2016) (per curiam). The Tennessee Supreme Court, however, welcomed this court to send it both the statutory and the constitutional questions, noting:
Nothing in the Court's Order is intended to suggest any predisposition by the Court with respect to the United States Court of Appeals for the Sixth Circuit's possible certification to this Court of both the question of the availability of the remedy of common law punitive damages in addition to the remedy of the statutory bad faith penalty and the question of the constitutionality of the statutory caps on punitive damages, in the event of an appeal from the final judgment in this case.
Lindenberg , 2016 Tenn. LEXIS 390, at *2 n.1.
I would accept this invitation; but the majority has declined. And so I proceed to the merits.
II.
This case asks what remedies are available to an insured who believes that her insurer has, in bad faith, breached its obligation to pay on an insurance policy. In 1901, the Tennessee General Assembly enacted the bad faith statute, Tenn. Code Ann. § 56-7-105, which provides a 25% penalty in those circumstances-i.e., "in all cases" where an insurance company refuses, in bad faith, to pay an insurance claim. See Leverette v. Tenn. Farmers Mut. Ins. Co. , No. M2011-00264-COA-R3-CV, 2013 WL 817230, at *17 (Tenn. Ct. App. Mar. 4, 2013) (quoting Tenn. Code Ann. § 56-7-105(a) ). Tennessee courts have held, and repeatedly affirmed, that the bad faith statute precludes recognition of the common law tort of bad faith failure to pay an insurance claim. See Chandler v. Prudential Ins. Co. , 715 S.W.2d 615, 618-21, 625 (Tenn. Ct. App. 1986) ; Leverette , 2013 WL 817230, at *17-18. The fundamental question in this litigation is whether the bad faith statute likewise precludes a claim for punitive damages arising from a common law breach of an insurance contract-put another way, whether the statute provides the exclusive "punitive" or "extracontractual" remedy for an insurer's bad faith failure to pay.
This court has already answered, "Yes." See Heil Co. v. Evanston Ins. Co. , 690 F.3d 722, 728 (6th Cir. 2012). Lindenberg, the district court, and the majority all say, *373 "No." They say that Lindenberg may also recover punitive damages based on Jackson National's bad faith breach of contract. But of course, the breach of contract in this case is the failure to pay on the insurance claim. And to get punitive damages, if they are allowed at all, Lindenberg would have to prove something more than just a breach of contract-she would have to show conduct amounting at least to "bad faith." See Rogers v. Louisville Land Co ., 367 S.W.3d 196, 211 n.14 (Tenn. 2012) (explaining that punitive damages are "limited to 'the most egregious cases' and [are] proper only where there is clear and convincing proof that the defendant has acted either 'intentionally, fraudulently, maliciously, or recklessly' " (citation omitted) ). Jackson National argues that punitive damages should not be layered on top of the statutory bad faith penalty.
In Heil , this court determined that the bad faith statute precludes punitive damages for common law breach of an insurance contract. Heil, 690 F.3d at 728. If Heil remains good law, it controls this case. The majority jettisons Heil based on one Tennessee intermediate appellate court decision, Riad v. Erie Insurance Exchange , 436 S.W.3d 256 (Tenn. Ct. App. 2013). Although an intermediate state appellate decision may displace this court's prior interpretation of state law, this rule does not obtain when there are persuasive reasons to believe the state's highest court would disagree. See Hampton v. United States , 191 F.3d 695, 701-02 (6th Cir. 1999). Here there are many. Riad 's analysis repudiating Heil rested entirely on that court's shaky assumption that an earlier Tennessee Supreme Court decision, Myint v. Allstate Insurance Co. , 970 S.W.2d 920 (Tenn. 1998), had already decided that the bad faith statute does not preclude punitive damages. See Riad , 436 S.W.3d at 276 (criticizing Heil for "ignor[ing] the Myint progeny of cases").[2] But we now know that Riad 's assumption was wrong. The Tennessee Supreme Court has told us so: "The issue of the availability of the common law remedy of punitive damages in addition to the statutory remedy of the bad faith penalty is one which has not before been addressed by this Court ...." Lindenberg , 2016 Tenn. LEXIS 390, at *2. That eviscerates Riad 's analysis. But even apart from its order regarding certification, there are reasons to doubt that the Tennessee Supreme Court would adopt Riad 's reasoning.
To begin with, Myint did not directly address the question at issue in Heil . In Myint , the plaintiffs brought claims under both the bad faith statute and the Tennessee Consumer Protection Act (TCPA), Tenn. Code Ann. §§ 47-18-101 et seq ., as well as a claim for breach of contract. 970 S.W.2d at 923. But Myint did not address the breach of contract claim, nor did it mention punitive damages at all. Rather, Myint focused on whether the TCPA applied to the insurance industry, given that the industry was already subject to Tennessee's comprehensive insurance code. See id. at 922 ("[T]he insur[e]r insists that the acts and practices of an insurance company are never subject to the [TCPA]."). Myint held that insurers were not exempt from the TCPA for two reasons. First, the court concluded, the state's insurance statutes, including the bad faith statute, "do not foreclose application of the [TCPA] to insurance companies." Id. at 925. Second, the court noted that the TCPA contained "crystal clear" language demonstrating *374 that its remedies are cumulative to all others available under state law. Id. at 926.
Although Myint focused on the cumulative nature of the TCPA, Riad latched onto the high court's statement that it could "find nothing in either the Insurance Trade Practices Act or the bad faith statute which limits an insured's remedies to those provided therein." See 436 S.W.3d at 274 (emphasis added) (quoting Myint , 970 S.W.2d at 925 ). From this comment, Riad inferred that plaintiffs could recover both the statutory bad faith penalty and punitive damages for breach of contract. Although this is a facially plausible inference, other evidence casts serious doubt on whether the Tennessee Supreme Court would agree.
Pre- Myint cases held that the bad faith statute precludes common law claims for damages arising from an insurer's bad faith failure to pay. So Heil 's conclusion was not new. Heil based its holding on two decisions-one federal, one state-that had construed the bad faith statute as an exclusive remedy. See Mathis v. Allstate Ins. Co. , No. 91-5754, 1992 WL 70192, at *4 (6th Cir. Apr. 8, 1992) ("[T]he trial judge correctly noted that the 25 percent penalty provided for in [the bad faith statute] has been deemed the exclusive remedy for losses stemming from an insurer's bad faith refusal to pay a claim."); Berry v. Home Beneficial Life Ins. Co. , No. 1150, 1988 WL 86489, at *1 (Tenn. Ct. App. Aug. 19, 1988) ("Moreover, as to the claim for punitive damages, [the bad faith statute] is the exclusive remedy for bad faith refusal to pay claims arising from insurance policies.").
And, although we did not discuss it in Heil , the Tennessee Court of Appeals held, over a decade before Myint , that the bad faith statute precludes recognition of the common law tort of bad faith failure to pay on an insurance policy. See Chandler , 715 S.W.2d at 618-21. Chandler is not the work of the Tennessee Supreme Court, but there is no question that its holding regarding the bad faith penalty's preclusion of the common law tort of bad faith survived Myint . See Leverette , 2013 WL 817230, at *18 ("Neither this court nor the Tennessee Supreme Court has overruled or even questioned the continuing validity of Chandler ."); see also Fred Simmons Trucking, Inc. v. U.S. Fid. & Guar. Co ., No. E2003-02892-COA-R3-CV, 2004 WL 2709262, at *3 (Tenn. Ct. App. Nov. 29, 2004) (citing Chandler for Tennessee rule that "there is no tort of bad faith, but an insured can seek the statutory bad faith penalty when an insurance company refuses to pay"); Watry v. Allstate Prop. & Cas. Ins. Co. , No. M2011-00243-COA-R3-CV, 2011 WL 6916802, at *4 (Tenn. Ct. App. Dec. 28, 2011) ("Tennessee does not recognize a general common law tort for bad faith by an insurer against an insured; the exclusive remedy for such conduct is statutory, provided by [the bad faith statute]." (quotations omitted) ); 6111 Ridgeway Grp. LLC v. Phila. Indem. Ins. Co ., No. 15-2561-STA-cgc, 2016 WL 1045570, at *4 (W.D. Tenn. Mar. 15, 2016) (noting that "Tennessee courts have followed Chandler for thirty years"). Indeed, Riad itself acknowledged Chandler 's holding "that Tennessee did not recognize the tort of bad faith." Riad , 436 S.W.3d at 273. But, said Riad , "the court did not address the type of recovery [a] plaintiff could seek if she had brought a breach of contract action." Id.
I suppose this could be Tennessee's regime: Tennessee's bad faith statute precludes the common law tort of bad faith failure to pay on an insurance policy, per Chandler , and punitive damages flowing therefrom, per Chandler and Leverette , but permits punitive damages for the same failure to pay when that failure is cast, not *375 as tort, but as breach of contract, per Riad . But Riad 's own reasoning would foreclose it. If Riad is right about the force of Myint 's statement-"nothing in ... the bad faith statute ... limits an insured's remedies to those provided therein," Myint , 970 S.W.2d at 925 -then that should apply to the tort of bad faith as well as to a claim for punitive damages in contract. But Chandler expressly said otherwise, and nothing suggests that Myint repudiated Chandler in toto, or that all the post- Myint cases reaffirming Chandler are wrong. It seems far more plausible to me that Myint applied only to the TCPA.
No Tennessee state court decision has relied on Riad 's sui generis reading of Myint . One reason for this may be that the General Assembly legislatively reversed Myint 's holding in 2011 by enacting Tenn. Code Ann. § 56-8-113. That provision states that "title 50 and [title 56]," which include the bad faith statute, "shall provide the sole and exclusive statutory remedies and sanctions applicable to an insurer." Id . § 56-8-113. Riad acknowledged Myint 's abrogation in a footnote, see 436 S.W.3d at 274 n.3, but Riad did not need to address § 56-8-113 because it involved a cause of action that accrued well before 2011.[3] Here, however, the cause of action accrued after § 56-8-113 's enactment, so Myint has limited, if any, bearing on this case.
The majority dismisses the significance of Myint 's abrogation because § 56-8-113 provides that "[n]othing in this section shall be construed to eliminate or otherwise affect any ... [r]emedy, cause of action, right to relief or sanction available under common law." According to the majority, this statement "leaves intact Myint 's underlying conclusion" regarding the bad faith statute and so does not alter Riad 's holding regarding the availability of punitive damages for breach of contract. The problem with the majority's reasoning is that neither Myint nor any Tennessee case before Riad had affirmed that punitive damages were "available under common law" for breach of an insurance contract. As discussed above, when the General Assembly passed § 56-8-113 in 2011, all the caselaw on the subject held the opposite. And Riad was decided after § 56-8-113 was passed, so the General Assembly could not have contemplated, and ratified, Riad 's broad reading of Myint . Therefore, although § 56-8-113 preserved the common-law status quo, there is no indication that it preserved the availability of punitive damages in a case like this.
In sum, there are good reasons to question Riad 's interpretation of Myint : Myint 's focus on the TCPA, the absence of caselaw supporting Riad 's interpretation, the discordant Chandler line of cases, and Myint 's legislative abrogation. And all of this is reason to doubt that the Tennessee Supreme Court would agree with Riad and disapprove of this court's reasoning in Heil . But most importantly, we need not wonder whether Myint controls this case. The Tennessee Supreme Court has told us that Riad was wrong to think that it had settled matters in Myint : "The issue of the availability of the common law remedy of punitive damages in addition to the statutory remedy of the bad faith penalty is one which has not before been addressed by [the Tennessee Supreme] Court ...." Lindenberg , 2016 Tenn. LEXIS 390, at *2. Because we thus have serious reason to *376 doubt whether the Tennessee Supreme Court would agree with Riad , I would stick with our own precedent, Heil . I would therefore reverse the district court and vacate the punitive damages award.
III.
Deciding whether Tennessee's recently-enacted punitive damages cap comports with the Tennessee Constitution is doubly unnecessary. Certification would place the construction of the Tennessee Constitution in the hands of those entrusted with the document's safekeeping. Adhering to Heil would accomplish the same result. But after rejecting the Tennessee Supreme Court's assistance and our own precedent, the majority strikes down § 29-39-104 as infringing the Tennessee Constitution's jury trial guarantee. This doubly unnecessary holding is also doubly dubious: first, because it is not clear that the Tennessee Constitution's jury trial guarantee provides the rule of decision in this federal case; second, because any reasonable doubts about whether § 29-39-104 infringes the jury right-and there are many-require us to uphold the statute.
A. The Unanswered Erie Question
As a threshold matter, I question whether the contours of Tennessee's constitutional jury trial right are even relevant in this diversity case under Erie Railroad Co. v. Tompkins , 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). It was not, after all, a Tennessee jury that assessed Lindenberg's claim for punitive damages. Because we are in federal court, a federal jury did that, and then a federal judge applied Tennessee's punitive damages cap to that jury verdict. "Under the Erie doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law." Gasperini v. Ctr. for Humanities, Inc. , 518 U.S. 415, 427, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996). Tennessee's punitive damages cap is undoubtedly substantive . See id. at 428-29, 116 S.Ct. 2211. The damages cap would thus provide the rule of decision in federal court unless it were preempted by federal statutory or constitutional law or conflicted with a substantive provision of the state constitution. The question raised here is whether an apparently procedural guarantee of the state constitution-the right to jury trial-can provide the rule of decision in federal court.
Lindenberg unquestionably has a Seventh Amendment right to have a federal jury "determine the question of liability and the extent of the injury by an assessment of damages" in her breach of contract suit. Dimick v. Schiedt , 293 U.S. 474, 486, 55 S.Ct. 296, 79 L.Ed. 603 (1935). But she abandoned her Seventh Amendment challenge to the Tennessee punitive damages cap in the district court. Had Lindenberg brought such a challenge, it would have failed. Binding caselaw from this circuit rejected a Seventh Amendment challenge to Michigan's cap on medical malpractice damages on the ground that, in federal court, "the jury's role 'as factfinder [is] to determine the extent of a plaintiff's injuries,' not 'to determine the legal consequences of its factual findings.' " Smith v. Botsford Gen. Hosp. , 419 F.3d 513, 519 (6th Cir. 2005) (alteration in original) (quoting Boyd v. Bulala , 877 F.2d 1191, 1196 (4th Cir. 1989) ). Other circuits addressing state damages caps under the Seventh Amendment have reached the same conclusion. See Schmidt v. Ramsey , 860 F.3d 1038, 1045 (8th Cir. 2017) (rejecting Seventh Amendment challenge to Nebraska's cap on medical malpractice damages), cert. denied sub nom. S.S. ex rel. Schmidt v. Bellevue Med. Ctr. L.L.C. , --- U.S. ----, 138 S.Ct. 506, 199 L.Ed.2d 386 (2017) ; Davis v. Omitowoju , 883 F.2d 1155, 1165 (3d Cir. 1989) ("Where it is the legislature *377 which has made a rational policy decision in the public interest, as contrasted with a judicial decision which affects only the parties before it, it cannot be said that [a damages cap statute] offends either the terms, the policy or the purpose of the Seventh Amendment."); Boyd , 877 F.2d at 1196 (rejecting Seventh Amendment challenge to Virginia's cap on medical malpractice damages). Moreover, as the majority acknowledges, the Supreme Court has held that "[u]nlike the measure of actual damages suffered ... the level of punitive damages is not really a 'fact' 'tried' by the jury." Cooper Indus., Inc. v. Leatherman Tool Grp., Inc. , 532 U.S. 424, 437, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001) (quoting Gasperini , 518 U.S. at 459, 116 S.Ct. 2211 (Scalia, J., dissenting) ). These cases indicate that a federal court does not violate the Seventh Amendment by applying a cap imposed by state law to limit a federal jury's award of punitive damages.[4] Would a federal court violate Tennessee's jury trial right by applying the state's punitive damages cap to limit a federal jury's award of punitive damages? That Tennessee's jury trial right could be violated by capping the award of a non-Tennessee jury is certainly counterintuitive. But whether that is indeed the rule would seem to depend, at least in part, on whether the Tennessee jury trial right is substantive or procedural.
On its face, the right to trial by jury seems manifestly procedural. See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co. , 559 U.S. 393, 407, 130 S.Ct. 1431, 176 L.Ed.2d 311 (2010) (plurality) (characterizing a procedural rule as one that "governs only 'the manner and the means' by which the litigants' rights are 'enforced' " (quoting Miss. Pub. Corp. v. Murphree , 326 U.S. 438, 446, 66 S.Ct. 242, 90 L.Ed. 185 (1946) ) ). The Supreme Court has expressly held that "the right to a jury trial in the federal courts is to be determined as a matter of federal law in diversity as well as other actions." Simler v. Conner , 372 U.S. 221, 222, 83 S.Ct. 609, 9 L.Ed.2d 691 (1963) (emphasis added); see also Byrd v. Blue Ridge Rural Elec. Co-op., Inc. , 356 U.S. 525, 535-40, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958) (holding that plaintiff in diversity suit was entitled to jury trial even though negligence claim would have been tried by judge in state court); Fed. R. Civ. P. 38(a) ("The right of trial by jury as declared by the Seventh Amendment to the Constitution-or as provided by a federal statute-is preserved to the parties inviolate.").
Just as state law cannot shrink federal jury trial rights in federal court, see Simler , 372 U.S. at 222, 83 S.Ct. 609, I doubt whether state law could expand those rights. Could a litigant like Lindenberg insist on a jury trial, otherwise unavailable in federal court, on the ground that state statutory or state constitutional law required it? Although there are few cases on point, leading authorities suggest that she could not. See James Wm. Moore et al., 8 *378 Moore's Federal Practice - Civil § 38.14[2] (2018) ("When ... the state would grant a jury trial but the federal law would not, federal courts have held that federal law would also apply, and jury trial would be denied."); 9 Charles Alan Wright et al., Federal Practice and Procedure § 2303 (3d ed. 2018) ("It now also is clear that federal law determines whether there is a right to a jury trial in a case involving state law that has been brought in federal court, and that in such a circumstance, state law is wholly irrelevant."); Gasperini , 518 U.S. at 465, 116 S.Ct. 2211 (Scalia, J., dissenting) ("[N]o one would argue that Erie confers a right to a jury in federal court wherever state courts would provide it; or that, were it not for the Seventh Amendment, Erie would require federal courts to dispense with the jury whenever state courts do so."). Before Erie , the Supreme Court upheld a federal court's directed verdict on contributory negligence even though the Arizona Constitution required that issue to be left to the jury. See Herron v. S. Pac. Co. , 283 U.S. 91, 92-94, 51 S.Ct. 383, 75 L.Ed. 857 (1931). And Herron seems to have survived Erie . See Byrd , 356 U.S. at 538-40, 78 S.Ct. 893 (citing Herron ); Hanna v. Plumer , 380 U.S. 460, 473, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965) (same); see also Goar v. Compania Peruana de Vapores , 688 F.2d 417, 423 (5th Cir. 1982) (noting that federal law "operates not only to require a jury trial when state law would deny one ... but it also requires trial of certain issues by a judge when state law might allow a jury trial"). I thus have reservations about whether the scope of Tennessee's jury trial guarantee-a facially procedural right-provides the rule of decision in the dispute before us.
The majority, however, finds a substantive right-a right to unlimited punitive damages-in the state's procedural guarantee. Because this court has upheld damages caps in the face of a Seventh Amendment challenge, see Smith, 419 F.3d at 519, the majority's substantive right must derive from an attribute Tennessee juries do not share with their federal counterparts. The majority claims that Tennessee juries have traditionally possessed the authority to award punitive damages. But that does not seem to distinguish them from federal juries. See, e.g. , Day v. Woodworth , 54 U.S. 363, 371, 13 How. 363, 14 L.Ed. 181 (1851). The only difference the majority identifies is that, in its view, Tennessee treats punitive damages as a " 'finding of fact' within the exclusive province of the jury," impervious to judicial or legislative tinkering. In the federal system, by contrast, "the level of punitive damages is not really a 'fact' 'tried' by the jury," Cooper Indus., Inc. , 532 U.S. at 437, 121 S.Ct. 1678 (quotation omitted), and we have upheld caps on even non-punitive damages on the ground that "the jury's role 'as factfinder is to determine the extent of a plaintiff's injuries,' not 'to determine the legal consequences of its factual findings,' " Smith , 419 F.3d at 519 (quotation marks and alteration omitted). Tennessee law, as characterized by the majority, thus differs from federal law in its assignment of decisionmaking authority over punitive damages. But this difference would seem to be procedural, not substantive. See Schriro v. Summerlin , 542 U.S. 348, 353, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004) ("Rules that allocate decisionmaking authority in this fashion are prototypical procedural rules ...."). And in federal court, federal procedural rules control. See, e.g. , 9 Charles Alan Wright et al., supra , § 2303.
Still, I acknowledge that whether a state law is facially procedural may not, under the Supreme Court's Erie cases, be the end of the story. The Court has also applied an " 'outcome-determination' test" in light of the "twin aims of the Erie rule:
*379 discouragement of forum-shopping and avoidance of inequitable administration of the laws." Hanna , 380 U.S. at 468, 85 S.Ct. 1136. If the majority is right that Tennessee's procedural jury trial guarantee comprises a substantive right to unlimited punitive damages, refusing to apply that rule in federal diversity cases would be outcome-determinative as to damages and could certainly encourage forum shopping. Would that require us to apply Tennessee's procedural rule? The authorities cited above suggest that federal procedural rules would apply regardless, though there is some uncertainty over how the Supreme Court would answer the question. See Shady Grove , 559 U.S. at 416-17, 130 S.Ct. 1431 (Stevens, J., concurring) ("[T]here are some state procedural rules that federal courts must apply in diversity cases because they function as a part of the State's definition of substantive rights and remedies."); but see id. at 416, 130 S.Ct. 1431 (plurality) ("The short of the matter is that a Federal Rule governing procedure is valid whether or not it alters the outcome of the case in a way that induces forum shopping. To hold otherwise would be to 'disembowel either the Constitution's grant of power over federal procedure' or Congress's exercise of it." (quoting Hanna , 380 U.S. at 473-74, 85 S.Ct. 1136 ) ).
In sum, though I do not claim to have solved this Erie puzzle, I fear there may be no basis in this federal diversity action for adjudicating the constitutionality of Tennessee's punitive damages cap under Tennessee's jury trial guarantee.[5] In fairness to the majority, the parties have not briefed this issue-instead, they assumed that the scope of the Tennessee jury trial right decides this case. But before I would invalidate a state statute on the ground that it violates the state constitution, I would pause to ask whether the state constitutional question is even properly before us.
B. The Tennessee Constitution
Addressing Lindenberg's challenge under the state constitution, the majority concedes that federal courts must be "extremely cautious about adopting 'substantive innovation' in state law," Combs v. Int'l Ins. Co. , 354 F.3d 568, 578 (6th Cir. 2004) (citation omitted), and that Tennessee statutes receive "a strong presumption" of constitutionality when facing state constitutional challenges, Lynch v. City of Jellico , 205 S.W.3d 384, 390 (Tenn. 2006) (citation omitted). The Tennessee Supreme Court has even instructed that, "[w]hen addressing the constitutionality of a [state] statute," challenged on the ground that it violates the state jury trial right, a court must "resolve any reasonable doubt in favor of the legislative action." Helms v. Tenn. Dep't of Safety , 987 S.W.2d 545, 549 (Tenn. 1999). In other words, for the majority to strike down the punitive damages cap, it must prove beyond "any reasonable doubt" that the statute violates the Tennessee Constitution. The majority has not carried its burden.
There are ample reasons to doubt the majority's holding. First, § 29-39-104 never prevents the jury from doing what modern civil juries do: finding facts when facts *380 are disputed. Under § 29-39-104, the jury-which is not told about the cap-still performs its factfinding function. It is only after the jury has done its job that the trial court applies state law to limit the punitive damages award. This was essentially our reason for upholding Michigan's cap on medical malpractice damages against a Seventh Amendment challenge, see Smith , 419 F.3d at 519, and two state supreme courts have relied on similar reasoning to uphold statutes that limit damage awards. As the Alaska Supreme Court explained, "[t]he decision to place a cap on damages awarded is a policy choice and not a re-examination of the factual question of damages determined by the jury." Evans ex rel. Kutch v. State , 56 P.3d 1046, 1051 (Alaska 2002). "[T]he jury has the power to determine the plaintiff's damages, but the legislature may alter the permissible recovery available under the law by placing a cap on the award available to the plaintiff." Id . (citation omitted). The Virginia Supreme Court made the same point in upholding a statute limiting recovery in medical malpractice actions. See Etheridge v. Med. Ctr. Hosps. , 237 Va. 87, 376 S.E.2d 525, 529 (1989) ("Once the jury has ascertained the facts and assessed the damages ... the constitutional mandate is satisfied ... [and] it is the duty of the court to apply the law to the facts." (citations omitted) ).
In this case, the State's brief makes a similar argument by drawing an analogy to statutes that provide treble damages. See, e.g. , Tenn. Code Ann. § 47-50-109 (providing treble damages for inducing breach of contract). Under § 47-50-109, the jury first determines the plaintiff's actual damages, and then the trial court trebles the jury's finding so that the plaintiff receives the remedy required by law. See Buddy Lee Attractions, Inc. v. William Morris Agency, Inc. , 13 S.W.3d 343, 359-60 (Tenn. Ct. App. 1999). But if a statute enlarging damages set by a jury does not violate the jury right, it is hard to see why one reducing damages would do so-in a civil case, the jury right may protect defendants as much as plaintiffs. See Caudill v. Mrs. Grissom's Salads, Inc. , 541 S.W.2d 101, 106 (Tenn. 1976) (holding that trial judge abused its discretion by denying a jury trial where, "at the first opportunity, ... defendants sought to exercise their constitutional right to a jury trial"). Several state supreme courts have cited the existence of damage multipliers as a reason for upholding damages caps. See Arbino v. Johnson & Johnson , 116 Ohio St.3d 468, 880 N.E.2d 420, 432 (2007) ("We have never held that the legislative choice to increase a jury award as a matter of law infringes upon the right to a trial by jury; the corresponding decrease as a matter of law cannot logically violate that right." (emphasis in original) ); Kirkland v. Blaine Cty. Med. Ctr. , 134 Idaho 464, 4 P.3d 1115, 1119-20 (2000) (concluding that the historical existence of damage multipliers establishes that "the Framers could not have intended to prohibit in the Constitution all laws modifying jury awards" because "at the time the [Idaho] Constitution was adopted, the legislature had exercised its power to modify the common law of damages and increase the liability traditionally imposed on certain defendants").
The majority responds that damage multipliers, unlike damages caps, "do not undercut a jury's assessment of damages." This observation is true by definition. But whether a statute undercuts or augments a jury's award, such a statute interferes with the award the jury considered sufficient compensation for the plaintiff in the case of compensatory damages, or sufficient punishment for the defendant in the case of punitive damages. Here, the jury issued an award that it considered enough to punish the defendant's conduct. The majority *381 apparently believes that the General Assembly would not violate the jury trial right by insisting that this figure be doubled, but could not order it halved. I cannot discern the principle underlying the majority's distinction because we know that both civil defendants and civil plaintiffs in Tennessee enjoy the protections of trial by jury. See Caudill , 541 S.W.2d at 106.
The majority also, somewhat confusingly, characterizes this line of reasoning as "imply[ing] that § 29-39-104 is merely a regulation on the process of remittitur." The majority asserts that "the Tennessee Supreme Court has repeatedly rejected the General Assembly's attempts to regulate the exercise of remittitur[,] ... a judicial power that may be influenced-but not controlled-by the General Assembly." But casting a punitive damages cap as remittitur misunderstands the State's and Jackson National's arguments-arguments that this court and others have found convincing.[6]
The majority gives short shrift as well to the argument that the General Assembly's power to eliminate common law rights and remedies implies the power to limit punitive damages. This too, one would think, could create a "reasonable doubt" as to whether such a limitation violates the state's jury guarantee. But the majority claims that "this argument merely begs the question" because the General Assembly's power is subject to "constitutional limits," so, like suggesting that "parents may drive as fast as they wish because the parents make the rules," this "ignores a key constraint on the rulemaker's authority." But the argument here is not that the General Assembly can do whatever it wants. Rather, it is that the General Assembly's unquestioned ability to abrogate a *382 common law remedy[7] suggests that the legislature could also limit , under some circumstances, that same remedy. The greater power generally includes the lesser.[8] So if the former does not violate Tennessee's jury right, neither might the latter. The argument at least deserves more response than the majority affords it.
Finally, I wonder whether the majority has asked the wrong question entirely: whether juries had any ability to award punitive damages, in any kind of case, at the time the Tennessee Constitution was adopted. As the majority concedes, the Tennessee Constitution's promise that "the right of trial by jury shall remain inviolate," Tenn. Const. art. I, § 6, does not guarantee the right to a jury trial in every case. "Rather, it guarantees the right to trial by jury as it existed at common law under the laws and constitution of North Carolina at the time of the adoption of the Tennessee Constitution of 1796." Young v. City of LaFollette , 479 S.W.3d 785, 793 (Tenn. 2015) (emphasis added) (quotation marks and alteration omitted). Therefore, the relevant question would seem to be whether, in 1796, a North Carolina jury could have awarded punitive damages in a case like this one -a common law breach of contract action.[9] There is serious reason to doubt that it could. As explained below, punitive damages were not available at common law for breach of contract, with only narrow exceptions, not present here.
The majority looks at this case through a broader lens-asking whether punitive damages were ever determined by North Carolina juries in 1796.[10] It does that, perhaps, *383 because that is the way it is used to evaluating such claims. If we were trying to decide the scope of the federal jury trial right, our inquiry would focus not on whether the remedy Lindenberg seeks was one "which the common law recognized among its old and settled proceedings," but on whether the remedy she seeks is legal, rather than equitable, in nature. See Curtis v. Loether , 415 U.S. 189, 193, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974). Punitive damages being a "traditional form of relief offered in the courts of law," id . at 196, 94 S.Ct. 1005, Lindenberg would have a right to have a federal jury determine them, though, as discussed above, the Seventh Amendment would not bar application of a statutory damages cap, see Smith , 419 F.3d at 519. And, under the Supreme Court's decision in Curtis , Lindenberg's right to have a federal jury determine punitive damages would apply even "to new causes of action created by" statute. 415 U.S. at 193, 94 S.Ct. 1005. This is basically how the majority opinion proceeds. Because punitive damages were available in some kinds of cases in North Carolina in 1796, and because juries awarded those damages, the majority reasons that Lindenberg has a right to have the jury determine punitive damages (and Tennessee may not cap them).[11]
But Tennessee courts seem to apply the rule that Curtis rejected. Under Helms , when the General Assembly creates new rights or remedies-regardless of whether they are legal or equitable in nature-Tennessee's jury trial guarantee does not apply. Helms , 987 S.W.2d at 547. Would the Tennessee Supreme Court apply the rule in Helms to new common law remedies? See Young , 479 S.W.3d at 793-94 (rejecting jury trial guarantee for statutory retaliatory discharge claim and finding it significant that "even the common law tort of retaliatory discharge was only recognized by Tennessee courts in the 1980's"). The court does not seem to have decided this issue-another reason to certify the constitutional question rather than deciding it. But it is worth pausing to ask this question here because, although we have a common law cause of action (breach of contract) and a common law remedy (punitive damages), we have strong reason to believe that a North Carolina jury in 1796 could not have awarded punitive damages for breach of contract.
North Carolina currently adheres to the established common law rule that "punitive damages should not be awarded in a claim for breach of contract" absent an "identifiable tort" that accompanies the breach. Shore v. Farmer , 351 N.C. 166, 522 S.E.2d 73, 76-77 (1999) ; Restatement (Second) of Contracts § 355 ("Punitive damages are not recoverable for a breach of contract unless the conduct constituting the breach is also a tort for which punitive damages are recoverable."); 24 Williston on Contracts § 65:2 (4th ed.) (explaining that "exemplary or punitive damages are not generally recoverable in breach of contract actions, even where the contract is maliciously or intentionally breached"); 5 Corbin on Contracts § 1077 (1964) ("It can be laid down as a general rule punitive damages are not recoverable for breach of *384 contract ...."); William S. Dodge, The Case for Punitive Damages in Contracts , 48 Duke L. J. 629, 630 (1999) ("Traditionally, punitive damages have not been available for breach of contract.").[12] North Carolina recognizes two traditional exceptions to this rule, allowing punitive damages for a "breach of contract to marry," see Newton v. Standard Fire Ins. Co. , 291 N.C. 105, 229 S.E.2d 297, 301 (1976), and "a breach of duty to serve the public by a common carrier or other public utility," see King v. Ins. Co. of N. Am., 273 N.C. 396, 159 S.E.2d 891, 893 (1968). Beyond these narrow exceptions, juries in North Carolina lack discretion to award punitive damages for breach of contract.
I have uncovered no evidence suggesting that North Carolina juries ever possessed this discretion. Early decisions of the North Carolina Supreme Court show that the state's courts have long denied juries such discretion in breach of contract actions. In an 1843 decision, the Supreme Court of North Carolina explained that a jury's ability to impose damages was strictly constrained "in matters of contract":
It will never do in matters of contract to leave the question of damages to the arbitrary discretion of a jury.-There must be a rule whereby to assess them, although the application of that rule is with great propriety confided to the jury. And we know of no other that can legally be laid down, where there is no statutory provision on the subject, and the parties have not described any by the terms or nature of their contract, than that the person injured should be reimbursed what he has lost, and if no loss be shewn by parol, should be reimbursed to the extent of the loss which the law presumes.
Wood v. Skinner , 25 N.C. 564, 568 (1843) (per curiam) (emphasis in original). A breach of contract action authorized a jury to render compensatory or nominal damages-nothing more.[13] See, e.g. , *385 Richardson v. Wilmington & W.R. Co. , 126 N.C. 100, 35 S.E. 235, 235-36 (1900) ("There are many cases where an action for tort may grow out of a breach of contract, but punitive damages are never given for breach of contract (except in cases of promises to marry)."). This has long been the common law rule in England and America.[14]
Carruthers v. Tillman , 2 N.C. (1 Hayw.) 501 (1797), on which the majority principally rests, does not suggest otherwise. Carruthers was a nuisance suit-not a breach of contract action. 2 N.C. at 501. The evidence thus suggests that "the right to trial by jury as it existed at common law under the laws and constitution of North Carolina at the time of the adoption of the Tennessee Constitution of 1796" did not permit juries to award punitive damages in breach of contract actions .[15] Would the Tennessee Supreme Court hold that legislatively capping a punitive damages award for breach of contract violates the right to trial by jury if a North Carolina jury in 1796 could not have awarded punitive damages for breach of contract at all? I do not know. But in my view, this question raises one more "reasonable doubt" that should prevent us from striking down this statute.
It is telling that the majority cites no decision of the Tennessee Supreme Court-not one-that strikes down a law for violating the state constitution's guarantee of trial by jury, though there have been many such challenges.[16] The Tennessee *386 Supreme Court has made it very clear that, even with respect to statutes that are alleged to infringe the right to trial by jury, it "afford[s] considerable discretion to the General Assembly and resolve[s] any reasonable doubt in favor of the legislative action." Helms , 987 S.W.2d at 549. Because there are ample grounds for doubt, I would uphold the statute.
* * *
To close,[17] I think there are sound reasons to dispute the majority's conclusion that Heil no longer binds us. And the majority's hasty invalidation of Tennessee's punitive damages cap overlooks critical issues. Does Tennessee's constitutional jury trial right even supply the rule of decision in this case concerning a federal jury's ability to award uncapped punitive damages? And, if so, what of the credible counterarguments the majority opinion elides? Any reason to question the majority's opinion on this score is also a reason to certify these questions to a willing Tennessee Supreme Court. If any federal court decision "risks friction-generating error," Arizonans for Official English v. Arizona , 520 U.S. 43, 79, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997), surely striking down a new state law on novel state-constitutional law grounds would do so. Because the majority does so today at the expense of comity and our cooperative federalism, I respectfully dissent.

I concur in Section A of the majority's opinion, which properly resolves the interpleader issue.

I remain uncertain just which cases Riad was referencing as Myint 's supposed "progeny." Riad cites none; I have found none.

In light of this, some federal district courts have construed Riad as applying only to pre-§ 56-8-113 actions. See Spring Place Church of God of Prophecy v. Bhd. Mut. Ins. Co. , No. 1:13-CV-405, 2015 WL 12531988, at *4 n.4 (E.D. Tenn. Mar. 16, 2015) ; Akers v. Allstate Prop. & Cas. Ins. Co. , No. 2:14-CV-72, 2015 WL 11005023, at *5 (E.D. Tenn. Sept. 28, 2015).

In Jones v. United Parcel Service, Inc. , 674 F.3d 1187, 1203 (10th Cir. 2012), the Tenth Circuit refused to apply a Kansas statute requiring the court-and not the jury-to determine the amount of punitive damages to be awarded. Jones affirmed "that the Seventh Amendment protects a federal plaintiff's right to have a jury determine the amount of a punitive damages award." Id . at 1204. But Jones also acknowledged that, under Cooper , punitive damages are not a finding of fact for the purposes of the Seventh Amendment's Reexamination Clause. Id . at 1205. Thus, Jones does not conflict with cases like Smith , Boyd , or Schmidt -or with the application of the damages cap in this case where the jury was allowed the opportunity to determine, in the first instance, the amount of the punitive damages award. Even if Jones did conflict with these cases, we would be bound by our own precedent, which has squarely decided the question. See Smith , 419 F.3d at 519.

Some federal courts have adjudicated challenges to state damage cap statutes based on the state constitutions' jury trial guarantees. See Boyd , 877 F.2d at 1195 (rejecting challenge based on Virginia Constitution's right to trial by jury); Learmonth v. Sears, Roebuck & Co. , 710 F.3d 249, 258-59 (5th Cir. 2013) (rejecting challenge to Mississippi damage cap predicated on Mississippi Constitution's jury guarantee after the Mississippi Supreme Court declined to resolve the question via certification). But those decisions do not explain why a state's jury trial guarantee should apply at all, and both upheld the challenged statutes.

Moreover, the majority misconstrues the Tennessee cases involving remittitur. None of the three cases cited by the majority supports its assertions about the General Assembly's power over remittitur. Borne v. Celadon Trucking Services, Inc. , 532 S.W.3d 274, 309-10 (Tenn. 2017), explains that the General Assembly first enacted a remittitur statute in 1911, thereby expressly authorizing remittitur "whenever the Trial Judge is of the opinion that the verdict in favor of a party is so excessive as to indicate passion, prejudice, corruption, partiality, or unaccountable caprice on the part of the jury." Several years later, in Grant v. Louisville & N.R. Co. , 129 Tenn. 398, 165 S.W. 963, 965 (1914), the Tennessee Supreme Court indicated that courts could also suggest remittitur when a verdict was merely "excessive." The majority characterizes Grant as "rejecting" the 1911 remittitur statute. Far from it. Grant states that the remittitur in question "was suggested because of passion and prejudice appearing to the circuit judge, and under the very terms of the statute plaintiff below was entitled to accept under protest and appeal. The Court of Civil Appeals affirmed the lower court, and this action was likewise justified by the very terms of the statute ." Id . at 966 (emphasis added). So after suggesting that the statute did not provide the exclusive rationale for suggesting a remittitur, Grant did not reject the statute, it applied it.
Nor does Foster v. Amcon International, Inc. , 621 S.W.2d 142, 145 (Tenn. 1981), imply some constitutional rejection of "hard and fast rules in reviewing additurs and remittiturs" imposed by the General Assembly, as the majority insinuates. In context, Foster 's reference to "hard and fast rules" concerns a prior decision, Smith v. Shelton , 569 S.W.2d 421 (Tenn. 1978), which "was written with a view to providing the appellate courts with guidelines, rather than hard and fast rules in reviewing additurs and remittiturs." 621 S.W.2d at 145. Foster nowhere purports to reject "hard and fast rules"-i.e., statutes-imposed by the General Assembly. In fact, Foster goes on to modify the standard articulated in Shelton because "such an interpretation would contradict the clear language and intent of the statute ." Id. at 147 (emphasis added). In other words, none of these cases questions the General Assembly's power to modify remittitur-if anything, they confirm that power.

See, e.g. , Mills v. Wong , 155 S.W.3d 916, 922 (Tenn. 2005) ("[T]he Tennessee General Assembly has the sovereign power prospectively to limit and even to abrogate common law rights of action in tort as long as the legislation bears a rational relationship to some legitimate governmental purpose.").

A better metaphor would therefore be that parents may determine how often their children may borrow the family car because parents determine whether their children may borrow the car at all.

The Tennessee Supreme Court has repeatedly employed a narrow inquiry when assessing whether a state statute infringes the jury right-and it has repeatedly upheld the challenged statutes. See Marler v. Wear , 117 Tenn. 244, 96 S.W. 447, 448 (1906) (finding no right to jury trial because "at common law no jury was impaneled in mandamus cases " (emphasis added) ); Jernigan v. Jackson , 704 S.W.2d 308, 309 (Tenn. 1986) (finding no right to jury trial because "jury trials in tax cases were not authorized" in North Carolina in 1789 and 1796 (emphasis added) ); Newport Hous. Auth. v. Ballard , 839 S.W.2d 86, 88 (Tenn. 1992) ("Although actions to recover possession of real property existed at common law the particular action of unlawful detainer resulted from the evolution of the law and did not appear in this State until passage of the first unlawful detainer statute in 1821." (emphasis added) ); Helms , 987 S.W.2d at 548 ("Our inquiry is whether at the time of 1796, North Carolina recognized civil forfeiture proceedings with the right to jury trials." (emphasis added) ); Young , 479 S.W.3d at 794 (finding no right to jury trial where statutory remedy for retaliatory discharge was "created long after the 1796 Constitution").

The majority suggests that this broader lens is fitting because Lindenberg's "challenge in this case is to a blanket statutory cap" that applies outside the breach-of-contract context. I take the majority to be suggesting that Lindenberg's challenge is facial, rather than as-applied. But assuming the facial nature of this challenge does not help Lindenberg. A facial challenge to a statute is "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the [statute] would be valid." United States v. Salerno , 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) ; Davis-Kidd Booksellers, Inc. v. McWherter , 866 S.W.2d 520, 525 (Tenn. 1993). And the Tennessee Supreme Court has stressed that "[t]he presumption of constitutionality applies with even greater force when a party brings a facial challenge to the validity of a statute." Waters v. Farr , 291 S.W.3d 873, 882 (Tenn. 2009). So if Tennessee's punitive damages cap can be validly applied in a common law breach of contract action-or in any other context-Lindenberg's challenge necessarily fails.

It is worth noting that only one of the North Carolina or Tennessee cases the majority relies on addresses the question at issue here: whether the legislature can limit punitive damages awards. The one case? Rhyne v. K-Mart Corp. , 358 N.C. 160, 594 S.E.2d 1, 10-14 (2004), which affirmed North Carolina's statutory cap on punitive damages.

Beginning in California in the 1970s, some courts have allowed punitive damages where, as here, an insurer has refused to pay a claim in bad faith. See Dodge, The Case for Punitive Damages in Contracts , 48 Duke L. J. at 637-39 ; Timothy J. Sullivan, Punitive Damages in the Law of Contract: The Reality and the Illusion of Legal Change , 61 Minn. L. Rev. 207, 241 (1977) (discussing "line of cases, originating in California, [that] has sustained the award of punitive damages in actions originating in the alleged breach of an insurance contract"). Since then, other state high courts have followed California in expanding the availability of punitive damages-some by characterizing the breach of an insurance contract as sounding in tort. Dodge, 48 Duke L. J. at 638-42. The North Carolina Supreme Court addressed this issue in Newton v. Standard Fire Insurance Co. , 291 N.C. 105, 229 S.E.2d 297, 303 (N.C. 1976). But the court declined to decide whether it would follow the new rule because the claim was not properly alleged. See id . at 303-04. Nevertheless, several decisions of the North Carolina Court of Appeals allowed punitive damages for the breach of an insurance contract where "plaintiffs had sufficiently alleged a tortious act accompanied by the requisite 'element of aggravation.' " See, e.g. , Von Hagel v. Blue Cross & Blue Shield of N.C. , 91 N.C.App. 58, 370 S.E.2d 695, 698-99 (1988). But these decisions constitute an application of the rule that punitive damages are permissible when a breach of contract is accompanied by an identifiable tort. They do not imply that North Carolina has abandoned its traditional approach to breach of contract claims. And of course, legal developments occurring in the 1970s and 1980s do not help us understand the purview of a North Carolina jury in 1796.

In Wood , the North Carolina Supreme Court acknowledged that compensatory or nominal damages might seem inadequate for particularly egregious breaches of contract. 25 N.C. at 568-69. But the court held that "these considerations are not for the court which tried the cause, nor are they for us. The constitution has provided another department of the government, to whom they may properly be addressed, and with whom they will no doubt have the weight to which they are entitled." Id. at 569. In other words, the North Carolina legislature could have authorized punitive damages in breach of contract actions, but juries had no inherent, or constitutional, power to award them.

This country's first treatise on the law of damages supports this proposition. See Theodore Sedgwick, A Treatise on the Measure of Damages 27-28 (New York 1847); id. at 36 ("We shall find that in cases of contract, the law takes no notice whatever of the motives of the defaulting party; that whether the engagement be broken through inability or design, the amount of remuneration is the same ...."). Likewise, the earliest English treatise on damages mentions no examples of juries awarding exemplary or vindictive damages in contract cases. See Joseph Sayer, The Law of Damages (London 1770). And although the amount of damages to be given was originally in the discretion of the jury, rules limiting damages for different types of contracts were becoming well-established by the end of the eighteenth century. See George T. Washington, Damages in Contract at Common Law (pt. 2), 48 L.Q. Rev. 90, 91-93 (1932) (discussing how new trial procedures and writs of inquiry led to development of concrete rules for damages in contract). To the extent there is uncertainty about the authority of colonial juries, the Tennessee Supreme Court has instructed us to resolve the uncertainty in favor of the challenged state law. Helms , 987 S.W.2d at 549.

The parties seem to agree that modern Tennessee caselaw has diverged from the traditional rule when it comes to awarding punitive damages. See Rogers , 367 S.W.3d at 211 n.14. But Tennessee looks to North Carolina law to interpret its constitutional right to a jury trial, see Helms , 987 S.W.2d at 549, and there is no evidence that any Tennessee divergence from North Carolina on this issue occurred in 1796. Indeed, one hundred and eighty years later, Tennessee cases squarely proclaimed adherence to the "traditional" rule. See Hutchison v. Pyburn , 567 S.W.2d 762, 766 (Tenn. Ct. App. 1977) ("[P]unitive damages may not be recovered in an action for breach of contract."); Johnson v. Woman's Hosp. , 527 S.W.2d 133, 141 (Tenn. Ct. App. 1975) ("Under the contract theory of the case punitive damages are not allowable ....").

See Marler , 96 S.W. at 448 (finding no constitutional right to jury trial in mandamus cases); Jernigan , 704 S.W.2d at 310 (finding no constitutional right to jury trial in tax cases); Ballard , 839 S.W.2d at 89 (finding no constitutional right to jury trial in unlawful detainer actions); Helms , 987 S.W.2d at 549 (finding no constitutional right to jury trial in civil forfeiture proceedings); Young , 479 S.W.3d at 793-94 (finding no constitutional right to jury trial in retaliatory discharge action).

The majority does not address Lindenberg's claim that § 29-39-104 violates principles of separation of powers under the Tennessee Constitution, so I do not address that claim either.